# VERMONT FARM MACHINE COMPANY

v.

# FRANCIS BATCHELDER & CO.

MAY TERM, 1896.

*Guaranty that article sold equals any other. Evidence. Power of county court to order production of writings. Remarks of attorney.*

1.  Plaintiff brought suit for the purchase price of a milk separator which he had sold defendant with a guaranty that it would do as good work as any other, if operated in the ordinary way. Plaintiff insisted that the milk should be separated at a temperature of from eighty degrees to ninety degrees, which was the ordinary way, and testified that at the time of making the contract of sale, which was in writing, he told the defendant that this was the temperature at which milk was ordinarily separated. *Held*, that in answer to this the defendant might show that at the time of making the contract he told the plaintiff that he required a separator which would skim the milk at seventy degrees.

2.  Under the above guaranty the defendant might show that the plaintiff's separator required more fuel to do the same amount of work than one of another make.

3.  In comparing this separator with one of another make the defendant might insist on having the test made at a temperature of seventy degrees if butter made from cream separated at that temperature is better than that made from cream separated at a higher temperature.

4.  On the same day of the purchase of the separator in question, the plaintiff sold the defendant another separator, identical in every respect, to be erected at Montpelier and the evidence of the defendant tended to show that it was then

agreed that the test between the separator of the plaintiff and another known as the Alpha, which the defendant then had in operation at Montpelier, was to be made and was made at Montpelier. *Held*, that the comparative operation of the two at Montpelier was admissible.

5. The declarations of the agents of the plaintiff sent to Montpelier for the purpose of conducting these tests, made in the course of their employment, are admissible.

6. The county court might under V. S., s. 1410, order the plaintiff to produce the letters of the agents in reference to these tests which were in the possession of the plaintiff, and which would probably make in favor of the defendant.

7. The court of chancery would not, upon bill of discovery, compel a defendant to produce writings which tended to support his own case, but would compel the production of those which were evidence for the orator.

8. The interest of a witness may be fully developed upon cross-examination, as by showing the commission which he receives for the sale of an article.

9. *Held*, that the remark of defendant's attorney upon cross-examination of a witness for the plaintiff was not, under the circumstances, error.

Assumpsit. Plea, the general issue. Trial by jury at the September term, 1895, Windsor county, TYLER, J., presiding. Verdict and judgment for the defendants. Plaintiff excepts.

The plaintiff brought suit for the purchase price of one No. 1 United States Cream Separator furnished under written contract with the defendants. The material part of this contract was as follows:

"The Vermont Farm Machine Company agrees to furnish Francis Batchelder & Co. one No. 1 United States Cream Separator, complete, with belt, one set of balls, one steel step, one set of rubber rings, one six-horse power Dutton vertical engine or one six-horse power Watertown horizontal engine, all to be placed and set up in the separator station at Plainfield, Vt., and guaranteed to do as good work as any other separator in the market, and to skim to one-tenth of one per cent. of fat or less; the machine to be prop-

erly operated. By 'properly operated' it shall be understood to mean that the machine shall be run at a speed of seven thousand two hundred revolutions per minute, and operated in every way in the same manner as usual in the ordinary method followed in the course of separating each day.

"In consideration of the separator being guaranteed as above, Francis Batchelder & Co, agree to pay the Vermont Farm Machine Company the sum of four hundred and fifty dollars for the outfit complete within thirty days from the time it is set up and tested, provided that the said separator shall for the thirty days continue to do the work guaranteed under the conditions described.

"It is further agreed by the Vermont Farm Machine Company, that, if at any time within one year from the acceptance of the said separator by Francis Batchelder & Co., said separator fails to regularly and uniformly produce the results guaranteed by the Vermont Farm Machine Company under the described conditions, after the Vermont Farm Machine Company have had an opportunity to correct any imperfections in the separator, they, the Vermont Farm Machine Company, are to remove the separator from the station upon request of Francis Batchelder & Co. In case of the removal of separator the Vermont Farm Machine Company are to pay Francis Batchelder & Co., within thirty days from the date of removal of said separator, a sum equal to the amount originally charged to Francis Batchelder & Co. for separator and fittings peculiar to same."

The evidence of the plaintiff tended to show that before the execution of the above contract the parties had some conversation in reference to a separator and a contract was drawn up by the plaintiff and submitted to the defendants and the one in suit was afterwards drawn up by a member of the defendant firm.

The evidence of the plaintiff further tended to show that the ordinary and usual temperature at which milk was separated was from eighty degrees to ninety degrees; that if the milk was separated at that temperature the separator in question would fully satisfy the guarantee of the plaintiff; that the defendants had refused to make the test with the

milk at that temperature, but had insisted upon its being tested with the milk at a temperature of from seventy degrees to seventy-two degrees, and had declined to receive the separator and pay for the same upon the ground that when so tested it would not fulfill the guaranty but was inferior to another separator known as the No. 1 Alpha.

As bearing upon the point whether the test should be made at the higher temperature as claimed by the plaintiff or at the lower temperature as claimed by the defendant, one of the agents of the plaintiff testified that before the contract was signed and at the time of its execution he informed the defendants that the ordinary temperature at which milk was separated was from eighty degrees to ninety degrees. In reply to this one of the defendants was permitted to testify that the said agent of the plaintiff made no statement whatever as to the temperature at which this separator was operated ; but that he, the defendant, then told said agent of the plaintiff that the defendants required a separator which would separate milk at a temperature of from seventy degrees to seventy-two degrees, and that the plaintiff so understood it when the separator was sold and the contract signed. To the admission of the above testimony the plaintiff excepted.

The evidence of the defendants tended to show that butter made from cream separated at a temperature of from seventy degrees to seventy-two degrees was better and would keep longer than that made from cream separated at a higher temperature ; that the defendants were familiar with this fact when the contract was made and informed the agent of the plaintiff of their ideas in that respect.

It appeared that the No. 1 Alpha separator in comparison with which that of the plaintiff was mainly tested, would separate cream at a temperature of from seventy degrees to seventy-two degrees, and the evidence of the defendants tended to show that at the time of making the contract they had an Alpha separator actually set up and in operation at

Montpelier, with which they were then separating cream at a low temperature. As tending to show that the separator of the plaintiff did not fulfill the guaranty, the defendants were allowed to give evidence of the fact that the plaintiff's separator required more fuel for the same amount of work than the Alpha separator. To the admission of this testimony the plaintiff excepted.

The separator in question was to be erected at Plainfield, Vt. It appeared that at the same time that the separator in question was sold to the defendants, they purchased of the plaintiff another separator, identical in every respect with this, which was to be erected at Montpelier, Vermont, and their testimony tended to show that it was then agreed that the test between the separator of the plaintiff and the Alpha should be made at Montpelier.

It further appeared that the plaintiff sent several agents to Montpelier for the purpose of representing it in the making of these tests between the Alpha machine and this machine, one of whom was a Mr. Remington, who at the time of the trial had become the agent of that company which was the proprietor of the Alpha machine. Mr. Remington was produced as a witness by the defendants, and testified that the tests in which he participated showed unfavorably to the machine of the plaintiff, that he so informed the plaintiff, and that the plaintiff endeavored to have him exchange the separator in question for another of their separators of a later and more approved type; that he attempted to make the change but was denied permission to do so by the defendants. The witness Remington produced in the course of his testimony certain letters and telegrams written to him by the plaintiff while he was at Montpelier, engaged in making the test, in reference to such test, and these letters were admitted in evidence against the exception of the plaintiff. The witness also testified that in reply to these letters and telegrams, he had written the plaintiff as to how the two

machines compared and that these letters would be favorable to the defendants.    Thereupon the defendants requested the plaintiff to produce these letters.    This the plaintiff declined to do unless so directed by the court.    The court did thereupon order the plaintiff to produce this correspondence, and the same was produced and introduced in evidence.    To the order of the court compelling it to produce these letters the plaintiff excepted.

The defendants were allowed to show the declarations made by Mr. Remington and the other agents of the plaintiff in the making of the tests at Montpelier, which were made at the time and in reference to those tests.    To the admission of these declarations the plaintiff excepted.

One James, a witness produced by the plaintiff, was inquired of upon cross-examination whether he was the agent of the plaintiff and whether he received a commission upon the separators sold by him, to which he replied in the affirmative.    The defendants were then permitted, against the exception of the plaintiff, to show by him that the amount of this commission was ten per cent.

In the course of the cross-examination of N. G. Williams, the manager of the plaintiff firm and a witness produced by it, the following questions were asked and answered, and the following exceptions taken :

Q.    You began to feel your machine was not good for anything there and you wanted to lay it to somebody else didn't you?

A.    No, sir.

Q.    That is pretty near it?

A.    No, sir; and you know it, too.

Q.    (By Mr. Martin.)    I know it is if you are going to put in what I know about it, and I say the correspondence shows it.

(Objection and exception by the plaintiff to statements made by Mr. Martin.)

(By Mr. Martin.)    I want to say further that this correspondence I have read to the witness shows I have a right to reply to what the witness says.

(Exception by the plaintiff to the last foregoing statements by Mr. Martin.)

Q.   You stated what I know about this.    Did you understand I had ever been up there to see these separators?

A.   No.

Q.   Or any other separators?

A.   Not as I know of.

*L. M. Read* and *Haskins & Stoddard* for the plaintiff.

The contract for the Montpelier separator was entirely distinct from that in suit; hence the declarations of the agents of the plaintiff in reference to the Montpelier machine were immaterial.    *Curtis* v. *Ingham,* 2 Vt. 287 ; *Tillotson* v. *McGrillis,* 11 Vt. 477 ; *Underhill* v. *Hart,* 23 Vt. 120 ; *Barnard* v. *Henry,* 25 Vt. 289 ; *Haywood Rubber Co.* v. *Dunclee,* 30 Vt. 29 ; *Austin* v. *Chittenden,* 33 Vt. 553 ; *Mason* v. *Gray,* 36 Vt. 313 ; *Upham* v. *Wheelock,* 36 Vt. 27 ; *Earl* v. *Grout,* 46 Vt. 113 ; *Baldwin* v. *Doubleday,* 59 Vt. 7.

The court of chancery would not have compelled the production of the letters from Remington to the plaintiff and therefore the county court had no power to order their production. *Haskell* v. *Haskell,* 3 Cush. 542 ; *Wilson* v. *Webber,* 2 Gray 558.

*Waterman, Martin & Hitt* and *J. P. Lamson* for the defendants.

The testimony of the agent of the plaintiff as to what was said in reference to temperature gave the defendants a right to prove what was actually said at that time. *Perry* v. *Moore,* 66 Vt. 519 ; *Lytle* v. *Bond's Est.,* 40 Vt. 618 ; *Mattocks* v. *Lyman,* 18 Vt. 98 ; *State* v. *Mahon,* 32 Vt. 241 ; *State* v. *McDonnell,* 32 Vt. 491.

If one party introduces inadmissible testimony without objection which merely tends to support the issue on his

part, the other party may explain it by similar testimony. *Perry* v. *Moore*, 66 Vt. 519.

Again the defendants had a right to show what the actual situation was at the time of making the contract as tending to explain the meaning of the contract itself. *Waite* v. *Fairbanks*, Brayt. 77 ; *Rugg* v. *Hale*, 40 Vt. 138 ; *Noyes* v. *Canfield*, 27 Vt. 79 ; *Paper Co.* v. *Moore*, 10 N. E. Rep. 851 ; *Beason* v. *Keize*, 29 N. W. 230 ; *Bacon* v. *Dodge*, 62 Vt. 460 ; 1 Greenl. Ev., s. 277.

The extent of the cross-examination of Mr. James rested in the discretion of the trial court. *Congdon* v. *Scale Co.*, 66 Vt. 255.

ROSS, C. J.    The action is to recover for a No. 1 United States Cream separator and other property to be used in setting up and propelling the separator at Plainfield, Vt.,

"And guaranteed to do as good work as any other separator in the market and to skim to one-tenth of one per cent. of fat or less ; and to skim of summer milk twenty-two hundred pounds per hour and of winter milk eighteen hundred pounds per hour—the machine to be properly operated. By 'properly operated' it shall be understood to mean that the machine shall be run at a speed of seventy-two hundred revolutions per minute, and operated in every way in the same manner as usual in the ordinary method followed in the course of separating each day."

The separator was to be tested and to continue for thirty days to do the work guaranteed under the conditions described. The issue was whether the separator answered the guarantee.

I.    The plaintiff gave testimony that, at the time the contract was signed, he explained that by the term "in the usual and ordinary method" as regards the temperature of the milk was meant eighty to ninety degrees in winter and seventy degrees on an average in summer. This testimony was admitted against the exception of the defendants. It opened the door for them to give evidence of what was said on the sub-

ject on that occasion. Nor was any of the testimony excepted to, given by them, outside the scope of the subject opened by the plaintiff. It only gave the reason they had for insisting as they say they did that the term must mean at seventy to seventy-two degrees. The contract and evidence furnish another ground on which the defendants had the right to have the separator operated with the milk at seventy or seventy-two degrees in the winter. It was guaranteed to do as good work as any other separator in the market. The Alpha Separator was then in the market, and the main competitor of the separator in contention. The evidence tended to show that that separator did good work in the winter, when operated with the milk at this temperature, and that the cream thus produced made a better quality of butter. Hence, the defendants had a right to have it tested with the milk at this degree unless the term "in the usual and ordinary method" was to restrict the guarantee as claimed by the plaintiff's testimony. The charge on this testimony cannot be complained of by the plaintiff. By this testimony the plaintiff asked to have its guarantee limited by the construction, which it said would be placed on these words, to a test with the milk at eighty to ninety degrees in the winter when compared with the Alpha. If the admission of this testimony was an attempt to read into the contract something that was not there as contended by the attorney for the plaintiff, it was allowed at the asking of the plaintiff. The exceptions do not raise the question whether this testimony of the plaintiff was properly admitted and that question is not considered.

II. The plaintiff excepted to testimony admitted to show the power and fuel required to operate the separator as compared with the same required to operate the Alpha. He contends that the guarantee "to do as good work as any other separator in the market and to skim" etc., relates not to the economy or expense of doing the work, but to its

quality, or that it would skim as much milk and as clearly of fat as any other separator on the market. The subject matter of the contract was the sale of the separator. The guarantee was with reference to its value when compared with other separators then in the market. It was not the intention of the defendants in requiring, nor of the plaintiff in giving the guarantee to bind the defendants to keep and pay for the separator, if by the test, it was found that it skimmed the milk as clearly of fat and did the work as rapidly as any other separator in the market, but at much greater expense. It was intended that by the guarantee the defendants should secure a separator as good or valuable, everything being considered, as any other in the market, and one which fully met the requirements expressed in the guarantee. When the subject of a contract is the sale of a machine guaranteed to do as good work as any other like machine in the market the value of the machine when compared with other like machines depends upon whether it can do the same amount and quality of work at the same expense. If it cannot it does not do as good work within the meaning intended by the parties as the other.

III. On the day before the contract in contention was made, the parties thereto made another conditional sale and purchase of another No. 1 United States Cream Separator to be set up and tested by the side of the Alpha Separator in the defendants' factory at Montpelier. The two separators conditionally sold by the plaintiff to the defendants were in every respect alike and were set up and operated very nearly concurrently, and were to be tested by the same agents of the plaintiff. The defendants' testimony tended to show, that it was understood between the parties, that the tests between the two separators bargained for by the defendants, and the Alpha should be made at Montpelier, as that was the only station where there was an Alpha with which to compare the workings of the machines, when stand-

ing side by side.  If this understanding was established, it made the comparisons between the United States Separator at Montpelier and the Alpha pertinent testimony on the question whether the separator in question would answer the guarantee of the plaintiff, that it should do as good work as any other separator in the market.  If this understanding should not be established, inasmuch as the United States Separator in contention was identical in construction and size with the one at Montpelier, the working of the latter, when compared with the working of the Alpha under like conditions, was admissible upon the question whether the separator would answer the guarantee, or do as good work as the Alpha.  The action of the plaintiff made the use of this class of testimony the more necessary.  It refused to make the test called for by the contract because the defendants insisted as they had the right to, unless the guarantee was limited as claimed by the plaintiff by what was said at the time the guarantee was given as shown in point one—that the test should be made with the winter milk at about seventy-two degrees.  With this understanding established the agents of the parties, who made the tests of the two separators at Montpelier, were their agents with reference to the test of the Plainfield separator when compared with the Alpha, and their declarations and admissions, made within the scope of their agency, in regard to the tests of the separators at Montpelier, were the declarations and admissions of the parties, not only in regard to the separator at Montpelier, but also in regard to the separator at Plainfield as compared with the Alpha at Montpelier.  As no exceptions were taken to the charge of the court in regard to the use which the jury were to make of this testimony it is to be assumed that the court gave the proper and necessary instructions on the subject. None of the declarations and admissions of the agents of the plaintiff who made the tests between the separators at Montpelier admitted so far as brought to our attention were outside the scope of their agency.

IV.   George R. Remington was one of the plaintiff's agents who made the tests between the separators at Montpelier.   While those tests were being made the plaintiff's manager wrote him a number of letters and sent him telegrams giving him directions and instructions in regard to making the tests and in regard to substituting another United States Cream Separator of a new and different construction, in some respects, from the one which the plaintiff had conditionally sold and placed on trial there. . These were produced and given in evidence by the defendants.   The exception to their admission taken by the plaintiff on the trial is not now insisted upon.   To these telegrams and letters Mr. Remington replied.   These replies were in the hands of the plaintiff.  They tended to support the contentions of the defendant in regard to the issues raised in the trial before the jury.   Against its exception, the court ordered the plaintiff to produce them for the inspection and use of the defendants.   The plaintiff contends that the court had no power to make this order.  By V. S., 1,410, it is enacted:

"The supreme and county courts may in the trial of actions at law on motion and due notice thereof given, require the parties to produce books or writings in their possession or power, which contain evidence pertinent to the issue or relative to the actions where they might be compelled to produce the same by the ordinary rules and proceedings in chancery."

The remainder of the section does not relate to the power conferred.   On the authorites cited by the plaintiff, (Daniels Ch. Proc. 579, 5th ed.; *Haskell* v. *Haskell*, 3 Cush. 542; *Wilson* v. *Webber*, 2 Gray 558;) the court of chancery has power to compel a party to discover and produce any book or writing which is in his possession or power, and which is material for the establishment of the issues to be established by the orator.   The orator by a bill of discovery cannot compel the production of books or writings which are only evidence to establish the defendants' contentions.   The de-

fendant in a bill of discovery is called upon to make answer to the claims of the orator set forth in his bill, but cannot be called upon to produce the written evidence which he relies upon to support his answer. His conscience cannot be probed for that purpose. But if he has in his possession or power, any books or writing relevant to the rights of the orator set forth in the bill, it is against good conscience and equity that he should withhold the same from the orator, and he can be compelled to discover and produce them. If the jury should find, as the defendants' testimony tended to show, that the tests between the United States Cream Separator and the Alpha at Montpelier, by the agreement of the parties, were to be tests between the separator in contention and the Alpha, then the telegrams and letters ordered to be produced and admitted, were relevant and material to the issues made by the testimony. They were sent and written in reply to the telegrams and letters of the plaintiff, through its officers and agents, Northrop and Williams, which it is now conceded by the plaintiff were properly received in evidence, and were necessary for a proper understanding of the latter, and also tended to contradict Williams' testimony, that he did not attempt, secretly, to have United States Cream separator B. substituted for the United States Cream Separator A. at Montpelier, and also in that he was not endeavoring to charge the failure of the latter to stand the test with the Alpha upon the witness Remington.

V. There was no error in the extent of the cross-examination of J. H. James. The interest of a witness, and its extent, may always be shown to be considered by the jury in weighing his testimony. The limits of such cross-examination are somewhat within the discretion of the court. It is never error to allow, by cross-examination, a full and fair development of the witness' interest. We do not say it would have been error to have excluded the inquiry in regard to the amount of commission which the witness received while in the

plaintiff's service.    But it was not error to allow the inquiry and admit the answer.

VI.    The remark of the defendant's attorney, when cross-examining the plaintiff's manager, to which exception was taken, was provoked and called out by the uncalled for personal declarations of the witness.    At most it was only the statement of the attorney's views of the construction to be placed on the correspondence referred to.    It were better, if it had not been made, as the attorney now concedes.    Under the circumstances, of which the jury were cognizant, it was not erroneously prejudicial to the plaintiff.    This disposes of the exceptions now relied upon.

*Judgment affirmed.*

Taft, J., being absent in county court, did not sit.